DA 10-0481

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 27

JOE and KATHRYN NORRIS,
INDIVIDUALLY AND ON BEHALF
OF THEIR MINOR SON, T.M.N.,

      Plaintiffs and Appellants,

   v.

DR. BLAYNE FRITZ,

      Defendant and Appellee.

| | |
|---|---|
| APPEAL FROM: | District Court of the First Judicial District, In and For the County of Lewis and Clark, Cause No. CDV 2005-287 Honorable Kathy Seeley, Presiding Judge |

COUNSEL OF RECORD:

      For Appellants:

            Linda M. Deola; Jonathan R. Motl; Morrison, Motl & Sherwood, PLLP, Helena, Montana

      For Appellee:

            Gary Kalkstein; C.J. Johnson; Kalkstein, Johnson & Dye, P.C., Missoula, Montana

Submitted on Briefs: November 10, 2011
Decided: February 7, 2012

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Kathryn Norris and Joe Norris (collectively Norris) appeal from a judgment in the First Judicial District, Lewis and Clark County, following a jury trial. We reverse.

¶2 Norris raises the following dispositive issue:

¶3 *Did the District Court abuse its discretion when it determined that the pre-trial circumstances warranted excluding a treating physician's testimony regarding the appropriate standard of care?*

¶4 Kathryn contracted a viral infection eight months into her pregnancy with T.M.N. Doctors advised an immediate C-section. Doctors delivered T.M.N. through C-section the next day on October 11, 2001. The treating pediatrician, Dr. Tom Strizich (Strizich), admitted T.M.N. to the Special Care Nursing unit later that same day following a cyanotic episode.

¶5 Strizich ordered an IV with glucose. He also directed that T.M.N.'s blood glucose be tested the morning of October 12, 2001. T.M.N.'s blood glucose test revealed a reading of 63. Strizich responded to the 63 result by increasing the rate of the IV infusion and thereby increasing the amount of glucose that T.M.N. was receiving. He ordered a re-testing of T.M.N.'s glucose for the morning of October 13, 2001.

¶6 Strizich served at that time in the same pediatric clinic as Dr. John Reynolds (Reynolds) and Dr. Blayne Fritz (Fritz). Reynolds took over T.M.N.'s care on the evening of October 12, 2001. Reynolds was caring for T.M.N. when the second glucose lab result arrived. The second lab result showed a glucose level of 38. The lab report identified the 38

2

level as "critical." The 38 level prompted lab employees to call the results to the nursing floor. Reynolds discontinued the IV and ordered no re-testing of T.M.N.'s glucose after T.M.N. began breastfeeding.

¶7 Fritz took over T.M.N.'s care at noon on October 13, 2001. Fritz had been made aware of T.M.N.'s earlier glucose results. Fritz did not restart the IV or order any follow-up tests. Fritz testified that he could monitor a baby's glucose level by visual inspection. He further testified that he believed that T.M.N. would receive sufficient glucose from his mother's milk.

¶8 A nurse found T.M.N. flaccid and unresponsive the morning of October 14, 2001. Fritz ordered a glucose lab test. The test result revealed that T.M.N.'s glucose level was zero. Doctors administered glucose. T.M.N.'s body began recovering after several hours, but he soon began having seizures. Doctors life-flighted T.M.N. to Benefis Hospital in Great Falls after he stabilized. T.M.N. suffered severe, permanent development issues.

¶9 Norris filed a complaint on May 5, 2005, against Reynolds, Fritz, and St. Peter's Hospital (collectively Defendants). District Judge Thomas Honzel assumed jurisdiction. The parties conducted extensive discovery. Pretrial proceedings continued for a number of months into years. These proceedings included a 2005 deposition of Strizich. Counsel for Norris and Defendants questioned Strizich at the deposition.

¶10 The parties identified their lay and expert witnesses in September, October, and November of 2006. Norris filed an expert disclosure that identified all of T.M.N.'s treating

3

physicians. Defendants filed motions in limine in March 2007 to prevent the treating physicians from providing opinion testimony. The District Court denied the motion.

¶11 The court determined that the treating physicians could provide expert testimony. The court noted that the treating physicians "were not retained . . . in advance of or for purposes of litigation" so an expert disclosure under M. R. Civ. P. 26(b)(4) was unnecessary. The order implied that the disclosure provided by Norris was wholly consistent with the scope of the treating physician's allowable testimony. The court concluded its order with the somewhat contradictory directive that Defendants could object at trial if "Plaintiffs are attempting to elicit opinions from the treating physicians beyond what is set out in the Plaintiff's disclosure. . . ."

¶12 Fritz's counsel filed another motion in limine in November 2008, after Judge Honzel's March 2007 order, to prevent the treating physicians from providing standard of care testimony. Norris's counsel filed a brief in opposition to that motion in December 2008. Neither party has cited any ruling by the District Court as to this motion in limine. And nothing in the record indicates whether the District Court provided any ruling.

¶13 Judge Honzel retired on December 31, 2008. District Judge Kathy Seeley assumed jurisdiction of the case. Norris settled with Reynolds and St. Peter's Hospital in 2009. The settlement left Fritz as the sole defendant. The court granted Fritz's motion for leave to re-depose certain treating physicians. Fritz did not seek to depose Strizich a second time.

¶14 The case went to trial on July 19, 2010. Norris's counsel described during her opening statement the events that culminated in T.M.N.'s developmental injury. She

4

specifically described the treatment offered by Strizich. She further informed the jury that Strizich would testify that a glucose level of 50 represents "his threshold for a baby like [T.M.N.]." She also stated that Strizich would testify that T.M.N. was hypoglycemic when the test results of October 13, 2001, revealed a glucose level of 38. Norris called Strizich as her first witness on July 21, 2010.

¶15 Before trial started that morning, however, Fritz moved to limit the scope of Strizich's proposed testimony. Fritz argued that he had become aware only during Norris's opening statement that Strizich would testify that he considered a sick newborn with a 50 glucose level to be at risk. Norris countered that Strizich would testify only to the standard of care for blood glucose level, but would not state specifically that Fritz had violated that standard in his treatment of T.M.N. The District Court granted Fritz's motion.

¶16 The court directed Strizich not to testify as to any standard of care. The court limited Strizich to testify as to his own personal practice. The District Court also instructed the jury that a physician's testimony regarding his personal practice does not establish a general medical standard of care. The jury returned a verdict in favor of Fritz. Norris appeals.

STANDARD OF REVIEW

¶17 We review for an abuse of discretion a district court's rulings on the admissibility of expert testimony. *Weber v. BNSF Ry. Co.,* 2011 MT 223, ¶ 18, 362 Mont. 53, 261 P.3d 984.

DISCUSSION

5

¶18    *Did the District Court abuse its discretion when it determined that the pre-trial circumstances warranted excluding a treating physician's testimony regarding the appropriate standard of care?*

¶19    Montana R. Civ. P. 26(b)(4) governs expert disclosures.  It allows a party, through interrogatories, to require the opposing party to disclose certain information regarding his expert and the expert's predicted testimony.  M. R. Civ. P. 26(b)(4).  These disclosure requirements eliminate surprise and promote effective cross-examination of expert witnesses. *Smith v. Butte-Silver Bow County*, 276 Mont. 329, 333, 916 P.2d 91, 93 (1996).  Absent such disclosures, a party would incur difficulty in ascertaining the particular approach of an adversarial expert. *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 72, 338 Mont. 259, 165 P.3d 1079.  Disclosure provides a party sufficient information and time, therefore, to plan effectively for cross-examination and to obtain an expert to refute the adversarial expert's testimony. *Superior Enters. LLC v. Mont. Power Co.*, 2002 MT 139, ¶ 18, 310 Mont. 198, 49 P.3d 565.

¶20    Notably, M. R. Civ. P. 26(b)(4) limits disclosure requirements to retained experts. Its language restricts the provision's application to "facts known and opinions held by experts . . . acquired or developed *in anticipation of litigation or for trial*. . . ." (Emphasis added). This language, when adopted, mirrored its federal counterpart.  The Federal Advisory Committee noted that Fed. R. Civ. P. 26(b)(4) had limited application when it adopted the rule.  It stated that the rule "does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to

6

transactions or occurrences that are part of the subject matter of the lawsuit." Fed. R. Civ. P. Comments (1970). The Committee determined that "[s]uch an expert should be treated as an ordinary witness." Fed. R. Civ. P. Comments (1970).

¶21    The rule's limited application supports the idea that the purpose underlying expert disclosure simply does not apply to non-retained experts. The M. R. Civ. P. 26(b)(4) disclosures and pre-trial depositions provide a party's only access to an adversarial, retained expert's identity and opinions. A retained expert's identity could remain unknown and his opinions unattainable until the expert disclosure deadline within a scheduling order. *See, e.g., Sunburst,* ¶ 70.

¶22    In contrast, a non-retained expert's role in the factual scenario makes his identity well known to both parties and his opinions more readily available. A non-retained expert typically will be a hybrid witness. This witness possesses personal knowledge of factual events relevant to the case. He also possesses specialized training that allows him to formulate expert opinions regarding those factual events. His involvement usually stems from his profession thereby making his expertise obvious. His opinions largely are ascertainable, therefore, and useful to any party who seeks them.

¶23    Courts from various jurisdictions recognize this concept, particularly with treating physicians. The California Supreme Court noted that treating physicians—who are inherently hybrid witnesses—can be identified early in the litigation through interrogatories or through discovery of the plaintiff's medical records. *Schreiber v. Estate of Kiser*, 989 P.2d 720, 725 (Cal. 1999). Opposing counsel also possesses a strong incentive to depose a

7

treating physician early in the litigation to ascertain his opinions. Opposing counsel can use the treating physician's opinion in order to assess the viability of the plaintiff's claims. *Schreiber,* 989 P.2d at 725. The treating physician's opinions are well known to opposing counsel long before the deadline for expert disclosures. *Schreiber,* 989 P.2d at 725. The court accordingly concluded that the rules governing disclosure of an expert's opinions do not apply to treating physicians. *Schreiber,* 989 P.2d at 725.

¶24 Other courts also have determined that concerns regarding the unfair surprise that accompanies an undisclosed expert do not apply to treating physicians. For example, the Utah Supreme Court recognized a party's ability to subpoena medical records to identify treating physicians. *Drew v. Lee,* 250 P.3d 48, 55 (Utah 2011). These medical records generally will provide greater information than any expert disclosure. The abundant information available through a party's medical records negates claims of unfair surprise from a treating physician's testimony. *Drew,* 250 P.3d at 55. *Drew* and *Schreiber* reached this conclusion in the context of a plaintiff asking the treating physician to opine as to the cause of the plaintiff's personal injury outside the medical malpractice realm. We agree with these courts that the heightened disclosure requirements of the opinions to be offered by retained experts do not apply to non-retained, treating physicians under these circumstances. *Schrieber,* 989 P.2d at 725; *Drew,* 250 P.3d at 55.

¶25 Few courts have addressed, however, whether a treating physician remains a hybrid witness when opining on the standard of care in medical malpractice cases. The Iowa Supreme Court has determined that, in ordinary circumstances, a treating physician may not

8

testify on the standard of care without a full expert disclosure. *Cox v. Jones*, 470 N.W.2d 23, 25 (Iowa 1991). In such circumstances, a physician's opinion regarding standard of care does not represent an obvious line of deposition inquiry, and thus, disclosure is required to prevent unfair surprise. *See Hansen v. C. Hosp. Corp.,* 686 N.W.2d 476, 481-82 (Iowa 2004).

¶26     The rule stems from the notion that a "physician *ordinarily* is not required to formulate such an opinion in order to treat the patient." *Hansen,* 686 N.W.2d at 482 (emphasis added). *Hansen*'s statement that an expert disclosure "may" be required and that disclosure "ordinarily" is necessary suggests, however, that a treating physician may be required occasionally to develop an opinion regarding standard of care in his treatment of the patient. *See Hansen,* 686 N.W.2d at 482.

¶27     Several courts have recognized expressly that a physician may develop an opinion regarding standard of care in his treatment of the patient. The Illinois Supreme Court ratified the "treating physician" exception to the expert disclosure requirement in *Boatmen's Natl. Bank v. Martin*, 614 N.E.2d 1194, 1201 (Ill. 1993). The Illinois court permitted a non-disclosed, treating physician to opine on the standard of care in a medical malpractice case. The court reasoned that the treating physician had offered this expert testimony based on information that he had acquired through his treatment of the plaintiff. The court cited the central role that the treating physician had played in the plaintiff's treatment to support the likelihood that he would have formed an opinion as to the cause of plaintiff's injury. *Boatmen's Natl. Bank*, 614 N.E.2d at 1203. The treating physician further testified that he

9

had formed his opinion when he had first examined the plaintiff, based on his own knowledge and experience, and well before the prospect of litigation had developed. *Boatmen's Natl. Bank*, 614 N.E.2d at 1203.

¶28 The California Supreme Court has offered similar reasoning. *Schreiber*, 989 P.2d at 726. The California court disagreed with an appellate court's determination that "a treating physician could never, regardless of the manner in which he obtained the factual basis of his opinion, testify as to the standard of care. . . ." *Schreiber*, 989 P.2d at 726. A treating physician's ability to testify as to standard of care instead would be determined by whether the physician formulated the opinion during medical treatment. *See Schreiber*, 989 P.2d at 726. Under these circumstances, prudent counsel would inquire during a deposition whether the treating physician had developed an opinion regarding the standard of care. *Schreiber*, 989 P.2d at 726. An opinion formulated by the physician regarding the standard of care in this context would be inherent to his treatment of the patient. *Schreiber*, 989 P.2d at 726.

¶29 Strizich's role required that he formulate an opinion regarding the requisite standard of care for treating T.M.N. even before the alleged negligence occurred. Strizich had to determine what standard of care needed to be employed to monitor T.M.N.'s glucose level when he initiated T.M.N.'s treatment. As a result, Strizich developed his opinion regarding standard of care in the context of patient treatment rather than in the context of litigation. Strizich accordingly remains a hybrid witness even for the purposes of standard of care testimony. *Schreiber*, 989 P.2d at 726.

10

¶30    Strizich's proffered testimony nevertheless required some disclosure to prevent unfair surprise. Indeed, the federal rules address squarely the issue of unfair surprise stemming from hybrid witness testimony. The federal rule distinguishes between the disclosure of the identity of a hybrid witness and disclosure of a hybrid witness's opinions. Federal R. Civ. P. 26(a)(2)(A) requires a party to disclose the identity of *all* witnesses who will provide expert testimony. Retained experts must additionally provide a report that includes "a complete statement of all opinions." Fed. R. Civ. P. 26(a)(2)(B). Non-retained experts, in contrast, must provide only a summary of their expected testimony. Fed. R. Civ. P. 26(a)(2)(C). Federal R. Civ. P. 26(a)(2)'s requirement that the identity of non-retained experts be disclosed, and the general nature of that expert's opinion, prevents unfair surprise. This same provision acknowledges that comprehensive disclosure for non-retained experts is unnecessary to prevent unfair surprise. Fed. R. Civ. P. 26(a)(2).

¶31    The language of M. R. Civ. P. 26 fails to provide the same level of clarity. Montana R. Civ. P. 26(b)(4) dictates the permissible disclosure for retained experts. This disclosure includes the identity of retained experts, the opinions of these retained experts, and the basis of those opinions. M. R. Civ. P. 26(b)(4). Our rules do not provide, however, any disclosure requirements for either identity or opinions of non-retained experts. M. R. Civ. P. 26(b).

¶32    Absent an express rule, we must review the pre-trial circumstances to determine whether sufficient notice existed of the non-retained expert's identity and any opinions to be offered by the non-retained expert to prevent unfair surprise. *Faulconbridge v. State,* 2006 MT 198, ¶¶ 43-44, 333 Mont. 186, 142 P.3d 777. We attempted in *Faulconbridge* to explain

11

the distinction between retained experts and non-retained experts. A full M. R. Civ. P. 26(b)(4) disclosure must be made for retained experts. *Faulconbridge*, ¶ 43. This same disclosure does not apply to non-retained experts. *See Faulconbridge*, ¶¶ 43-44. We suggested, however, that the opposing party should have adequate notice of the non-retained expert's testimony in order to be admissible. *See Faulconbridge*, ¶¶ 43-44.

¶33 The inquiry should focus on whether the objecting party had adequate notice of the non-retained expert's proposed testimony. The discussion in *Faulconbridge* parallels the principle established through M. R. Civ. P. 26(b)(4)—that opposing counsel have adequate notice of the identity of an expert and the expert's opinions to prevent unfair surprise. The standard also recognizes, though, that the comprehensive disclosure requirements of M. R. Civ. P. 26(b)(4) regarding an expert's opinion are not necessary to prevent unfair surprise when a hybrid witness provides expert testimony. *See Ostermiller v. Alvord,* 222 Mont. 208, 212, 720 P.2d 1198, 1201 (1986).

¶34 Our discussion in *Faulconbridge* proved central to Judge Honzel's 2007 order that allowed expert testimony from T.M.N.'s treating physicians. Norris's expert disclosure noted that the treating physicians were "hybrid witnesses" who need not be disclosed under Montana law. Norris identified all of T.M.N.'s treating physicians individually, including Strizich, as potential witnesses in her M. R. Civ. P. 26(b)(4) disclosure in order to "provide full disclosure and no surprise to the Defendants." Judge Honzel's order in 2007 agreed that the treating physicians qualified as hybrid witnesses who were not retained for litigation purposes.

12

¶35    Fritz contends that Judge Honzel's original scheduling order required Norris to "disclose expert witnesses together with Rule 26(b)(4), M. R. Civ. P., expert disclosures." We agreed in *Sunburst* that a disclosure requirement pursuant to an M. R. Civ. P. 16 order "carried the same effect as would a party's interrogatory" that requested disclosure of expert witnesses pursuant to M. R. Civ. P. 26(b)(4), and thereby negated "the need for either party to file interrogatories." *Sunburst*, ¶ 70. The district court excluded testimony from several of Texaco's retained expert witnesses due to Texaco's failure to provide full expert disclosures pursuant to M. R. Civ. P. 26(b)(4). We affirmed. *Sunburst*, ¶ 73. Here, of course, Strizich represents a hybrid witness based on his role as a treating physician for T.M.N. Montana R. Civ. P. 26(b)(4) limits full disclosure requirements to retained experts. Norris never retained Strizich.

¶36    Fritz does not contend that Norris failed to provide sufficient notice as to Strizich's identity. He argues instead that Norris failed to provide sufficient notice as to Strizich's opinions. Fritz contends that Strizich's proposed testimony regarding the standard of care for an infant's glucose level exceeded the scope of Judge Honzel's order. He further notes that Norris's disclosure fails to identify a level-specific blood glucose standard. Fritz claims that he first became aware of this standard, and Strizich's proposed testimony about it, during Norris's opening argument.

¶37    It would be difficult to conclude, based on the totality of the pre-trial circumstances, that Fritz lacked sufficient notice of Strizich's proposed testimony on standard of care to prevent unfair surprise. *Schreiber*, 989 P.2d at 726. The disclosure submitted by Norris on

13

October 16, 2006, stated that Strizich, as a treating physician, would testify as to the standard of care that he would employ generally. Similar to any treating physician, Strizich presumably would not create his own standard of care out of whole cloth. Strizich's standard of care instead likely would conform to his medical training, current medical literature, and to national practice. *Chapel v. Allison*, 241 Mont. 83, 92, 785 P.2d 204, 213 (1989). Cross-examination normally would reveal any faulty basis on which Strizich relied in opining as to standard of care. *N. Plains Resource Council v. Bd. of Nat. Resources & Conserv.,* 181 Mont. 500, 537, 594 P.2d 297, 317 (1979).

¶38 Fritz's access to T.M.N.'s medical records, particularly when the records catalog Strizich's own treatment, further negates Fritz's claim of unfair surprise at the prospect that Strizich would testify as to the standard of care for a newborn's blood glucose level. *Drew*, 250 P.3d at 55; *Boatmen's Natl. Bank*, 614 N.E.2d at 1201. These medical records contain several reports prepared specifically by Strizich. The records further detail Strizich's care of T.M.N. through notes prepared by assisting nurses and lab reports requested by Strizich. Strizich's opinion regarding the appropriate standard of care, therefore, should have been relatively obvious given his actions to treat T.M.N. *Schreiber*, 989 P.2d at 726.

¶39 Any ambiguity within these records readily could have been clarified through proper inquiry at Strizich's deposition. Strizich also opined in that deposition, without objection, that a newborn infant with a glucose level of 40 would be hypoglycemic. Norris's counsel highlighted this opinion by Strizich in her opening statement. Strizich also testified that a glucose level of 63 presented a normal level for an infant. Strizich believed that the

14

threshold for risk, therefore, fell clearly between a glucose level of 40 and 63. Fritz never inquired as to where Strizich specifically considered that the risk level fell.

¶40 Strizich repeatedly referred to his "standard teaching and training" and to "the teaching" that he had received in responding to questions. Some of these questions dealt specifically with matters related to blood glucose levels in newborns. Strizich's references to "standard teaching and training" and "the teaching" that he had received paraphrases the standard of care. Fritz's counsel left the matter hanging and took no steps to clarify when given the opportunity at Strizich's deposition.

¶41 Fritz later moved to re-depose various treating physicians after both parties had filed expert disclosures. The District Court granted Fritz's motion. Fritz did not re-depose Strizich. Fritz made this decision despite Strizich's central role in T.M.N.'s treatment and despite Norris's expert disclosure that indicated Strizich would testify to his standard of care in treating T.M.N. As noted by the court in *Schreiber*, defendants have a strong incentive to depose treating physicians "to ascertain whether their observations and conclusions support the plaintiff's allegations." *Schreiber*, 989 P.2d at 725. Fritz declined this second opportunity to depose Strizich.

¶42 Fritz himself actually admitted standard of care testimony from Dr. Donald Wight, who treated T.M.N. at Benefis Hospital. Neither party had disclosed Wight as an expert witness. Fritz nevertheless took advantage of the inquiry by Norris's counsel at Wight's deposition as to whether Wight had formed an opinion regarding the care that Fritz had provided to T.M.N. Fritz successfully moved the District Court, over Norris's objection, to

15

admit those portions of Wight's deposition that contained his standard of care opinion. Neither Fritz nor Norris asked Strizich during his deposition for his opinion regarding standard of care. In effect, Fritz seeks to distinguish the admissibility of opinion testimony from a treating physician on the basis of whether either counsel inquired on the matter during the treating physician's deposition. We decline to encourage counsel, plaintiff's or defendant's, to avoid obvious standard of care issues during a discovery deposition in order to claim unfair surprise at trial. We agree with the Ohio Supreme Court's conclusion that a defendant cannot claim unfair surprise when he could have inquired, at a deposition, into the treating physician's opinions. *See Savage v. Correlated Health Services*, 591 N.E.2d 1216, 1220 (Ohio 1992). As was the case with Strizich's testimony, the Ohio court determined that unfair surprise proved a difficult claim to substantiate when the "testimony on [the relevant issues] was fairly predictable." *Savage*, 591 N.E.2d at 1220.

¶43 Fritz reasonably cannot claim prejudice from Strizich's proposed testimony regarding a newborn's blood glucose level. This testimony related to a central issue in the case—whether Fritz violated the established standard of care for pediatricians by failing to monitor T.M.N.'s glucose levels adequately. Fritz clearly had identified T.M.N.'s blood glucose level to constitute a central issue for the jury's consideration. Fritz presented three separate experts who opined on the requisite standard of care regarding blood glucose levels. These experts functioned as a sufficient rebuttal to Strizich's proposed testimony.

¶44 Finally, any surprise claimed by Fritz derives from his narrow interpretation of Judge Honzel's order. Fritz contends that Judge Honzel's order allowed Strizich to testify only as

16

to his personal practice. This argument interprets Judge Honzel's order, however, as authorizing largely irrelevant and inadmissible testimony. A medical malpractice plaintiff must establish that a physician's conduct breached a national standard of care. *Chapel*, 241 Mont. at 92, 785 P.2d at 213. A physician's individual practice, when not based on national standards, lacks relevance to a medical malpractice case. *Collins v. Itoh*, 160 Mont. 461, 469, 503 P.2d 36, 41 (1972). Fritz's counsel argued this point extensively in opposing Strizich's proposed testimony on standard of care. Fritz's interpretation of Judge Honzel's order, however, would have allowed Strizich to offer only testimony that likely could have been excluded as inadmissible under M. R. Evid. 402. *Collins*, 160 Mont. at 469, 503 P.2d at 41.

¶45 Fritz alternatively argues that Strizich lacked the expertise to offer an expert opinion on blood glucose levels. He notes that Strizich could not explain in his deposition the cause of glucose problems present in newborns. For example, Strizich could not say with certainty whether the body uses more glucose if the infant is under distress. Strizich admitted in his deposition to little knowledge regarding glucose storage in infants at birth. Strizich also could not explain why unhealthy newborns are more likely to have a problem with glucose. Strizich further conceded in his deposition that depletion rates for glycogen stores following birth was "out of my expertise." Fritz cites similar examples from Strizich's deposition to contend that he lacked the requisite expertise to opine on the appropriate standard of care.

¶46 The examples cited by Fritz demonstrate that Strizich admittedly could not explain the pathophysiology that underlies glucose depletion in newborns. Strizich's inability to explain

17

why a medical condition occurs, however, does not necessarily prevent him from possessing expertise on the necessary medical treatment when the condition occurs. Fritz could have used Strizich's admissions regarding the limits of his expertise on cross-examination to undermine the weight of Strizich's testimony. *Kissock v. Butte Convalescent Ctr.*, 1999 MT 322, ¶ 20, 297 Mont. 307, 992 P.2d 1271. Strizich's admissions should not have affected the admissibility of his testimony regarding the standard of care for a pediatrician when faced with glucose-related concerns arising from his treatment of T.M.N. *Kissock*, ¶ 20.

¶47 We turn finally to the issue of whether the District Court's exclusion of Strizich's proposed testimony prejudiced Norris's case. Montana R. Civ. P. 61 dictates that a verdict may be set aside only if an error affects a party's substantial rights. We have recognized that a district court's ruling at trial may cause—through no fault of the party—unfair surprise that detrimentally prevents a litigant from presenting his case. *See Clark v. Bell,* 2009 MT 390, ¶ 30, 353 Mont. 331, 220 P.3d 650. We specifically determined in *Clark* that unfair surprise may occur when a district court issues a pre-trial order, but the district court only clarifies the scope of that order at trial. *Clark,* ¶ 30. This unfair surprise affects a party's substantial rights when it relates to, and prevents a party from, addressing adequately a material issue. *See Clark,* ¶ 30. Such circumstances warrant a new trial. *Clark*, ¶ 30.

¶48 Norris contends, and we agree, that exclusion of Strizich's proposed testimony caused unfair surprise. Norris had conducted video depositions with multiple witnesses. Norris argues that the admissibility of these video depositions rested upon Strizich's proposed standard of care testimony. Norris specifically, and fairly, had relied on Judge Honzel's

18

order to perpetuate this video testimony. Without Strizich's testimony, though, Norris claims that the video testimony was rendered useless as Norris could not modify these depositions, and had to forgo entirely the video testimony due to the court's late ruling.

¶49 Moreover, Fritz capitalized on Judge Seeley's ruling to undermine the importance of testimony of Strizich—Norris's primary medical witness. The jury instructions directed the jury not to consider any physician's personal practice as relevant to the standard of care. Fritz's counsel used this instruction to his advantage during the closing, stating, "Dr. Strizich talked about his personal practice. Dr. Strizich is a nice man, and he is a good pediatrician. But his personal practice, the law says, is not to be considered as establishing standard of care. . . ." This statement, combined with the jury instruction, undermined the importance of Strizich's testimony to Norris's case.

¶50 We determine that the District Court abused its discretion when it prevented Strizich from providing standard of care testimony. We reverse and remand with instructions to the District Court to vacate its judgment and order a new trial.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER

19