No. 84-07

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

LOUIS J. DALLAS,

        Plaintiff and Respondent,

  -vs-

BURLINGTON NORTHERN, INC.,

        Defendant and Appellant.

---

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable H. William Coder, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        K. Kent Koolen argued, Billings, Montana

    For Respondent:

        Terry Trieweiler argued, Whitefish, Montana

---

Submitted: September 27, 1984

Decided: October 15, 1984

Filed: OCT 1 5 1984

Ethel M. Harrison
Clerk

Mr. Justice Frank B. Morrison, Jr., delivered the Opinion of the Court.

Louis Dallas brought an action in the Eighth Judicial District Court pursuant to the Federal Employers' Liability Act (FELA) seeking damages for personal injuries sustained during the course of his employment with Burlington Northern, Inc. (BN). Following jury trial a verdict was returned in favor of plaintiff in the amount of $477,000. Burlington Northern's motion for a new trial was denied. This appeal followed. We affirm.

Louis Dallas began working for BN in 1971 as a switchman and brakeman. In 1975 he was promoted to locomotive engineer.

On October 18, 1980, Dallas was operating a freight train from Glasgow, Montana to Minot, North Dakota. He stopped the train on a siding at Blair, Montana to permit a westbound train with a superior right to pass. While stopped on the siding, Dallas decided to use the rest room facilities.

The toilet compartment, located in the nose of the locomotive two feet below the floor level of the cab, was entered through a low doorway on the front wall of the cab. The stair-step into the compartment was an iron box which also served as a toolbox. The toolbox structure, two feet long by one foot high, was secured to the floor of the compartment by spot welds.

Dallas claims that as he stood with both feet on the step his weight transferred to the front causing the back to come completely loose thereby tipping the step forward. When the step tipped forward Dallas testified that he fell against the side of the locomotive injuring his left shoulder, lower neck and back and left knee.

Dallas stated that after his fall, the step was completely on its side revealing the broken spot welds. The

2

break in the welds was confirmed by an inspection conducted by the mechanical department when the locomotive arrived at Minot, North Dakota. One of the three inspectors who tested the step in Minot, testified that, despite the broken welds, he was unable to cause the step to tip forward as described by Dallas.

There were no eye witnesses to Dallas' accident other than Dallas himself. A witness statement was taken from the locomotive fireman, James Morehouse, which indicated that Morehouse did not see Dallas fall, but heard "banging and all kinds of commotion . . ." Morehouse died in an off-duty accident shortly after Dallas' accident, and his unsworn statement was received in evidence.

Following the accident, Dallas returned to Glasgow, Montana, acting as fireman instead of engineer because of soreness resulting from his fall. On October 20, 1980, a physician's assistant at the Smith Clinic in Glasgow examined Dallas for his injuries. He found tenderness along the left paravertebral muscle, diagnosed a muscle spasm and prescribed rest, heat and relaxants.

When his condition did not improve Dallas was referred to Dr. Peter Teal, an orthopedic surgeon in Billings, Montana. On November 4, 1980 Dr. Teal diagnosed an acute strain of the upper thoracic and lower cervical spine and prescribed physical therapy and muscle relaxants.

Dallas sought a second medical opinion from Dr. James Laidlaw, an orthopedic surgeon, in Kalispell, Montana. He continued under Dr. Laidlaw's treatment of physical therapy, medication and cervical traction until the latter part of 1981. Dr. Laidlaw referred Dallas to Dr. Schimpff, a neurologist, who cared for Dallas from November, 1981 to June, 1983. Dr. Schimpff's recommended course of treatment was intermittent use of anti-inflammatory agents, intermittent physical therapy, and curtailment of physical

3

activities. Dr. Schimpff was unable to pinpoint a single basis for plaintiff's complaints, but offered three possible diagnoses: either a herniated cervical disc; a thoracic outlet syndrome; or a chronic strain.

No myelogram nor surgical procedures were performed in connection with this injury. Dallas was hospitalized for injuries sustained in a head-on automobile accident on August 18, 1982, but never was admitted to a hospital as a result of the accident which is the subject of this appeal.

Dallas presented evidence that he was only able to work about 70% of the time without aggravating his symptoms. He claimed a loss of future earning capacity equivalent to a 30% reduction in his full-time wages. An economist testified that Dallas' past wage loss was approximately $62,000 and his loss of future earning capacity was $415,000.

The trial court granted a partial summary judgment in favor of Dallas finding that BN had violated the Federal Boiler Inspection Act. The issues of causation and damages were submitted to the jury. A verdict was returned which awarded $477,000, a figure which equals the sum of past lost wages and loss of future earning capacity as reflected in the economic projection of plaintiff's expert.

Burlingtion Northern presents the following issues on appeal:

1. Whether the trial court erred in granting Dallas' motion for partial summary judgment on the violation of the Federal Boiler Inspection Act?

2. Whether the medical testimony offered by Dallas' physicians was sufficiently certain to be admitted and sufficiently probative to carry plaintiff's burden of proof on the medical issues?

3. Whether the trial court erred in refusing to instruct the jury regarding the effect of income taxes on the damages claimed by Dallas and awarded by the jury?

4

4. Whether the trial court erred in permitting Dallas to present testimony of a previously unidentified rebuttal witness?

5. Whether the verdict was excessive as a matter of law?

Summary judgment is not a substitute for trial and can only be granted when the record discloses no genuine issue of material fact entitling the moving party to a judgment as a matter of law. Hansen v. Transamerica Inc. Co. (1978), 175 Mont. 273, 573 P.2d 663.

Here the evidence clearly shows that the welds were broken. There is a conflict in the evidence respecting whether the breaking of the welds would cause the step to tip thereby causing the accident in question. The question becomes whether the Federal Boiler Inspection Act is violated as a matter of law given this factual record. The Act provides in relevant part that:

> "It shall be unlawful for any carrier to use or permit to be used in its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of sections 28 to 30 and 32 of this title and are able to withstand such test or tests as may be prescribed in the rules and regulations as may be hereinafter provided for."
> 45 U.S.C. section 23.

Plaintiff's action was instituted under the Federal Employers' Liability Act, (FELA), 45 U.S.C. section 51, which provides in relevant part that:

> "Every common carrier by railroad while engaging in commerce between any of the several States and Territories . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines . . . or other equipment."

5

The United States Supreme Court discussed absolute liability features of section 23 and its interrelation with section 51, in Lilly v. Grand Trunk Western R. Co. (1943), 317 U.S. 481, 485-86, 63 S.Ct. 347, 87 L.Ed. 411. The Supreme Court said:

> "Negligence is not the basis for liability under the Act. Instead, it 'imposes upon the carrier an absolute and continuing duty to maintain the locomotive, and all parts and appurtenances thereof, in proper condition, and safe to operate . . . without unnecessary peril to life or limb.' (citations omitted.) Any employee engaged in interstate commerce who is injured by reason of a violation of the Act may bring his action under the Federal Employer's Liability Act, charging the violation of the Boiler Inspection Act (citations omitted.) The Act, like the Safety Appliance Act, is to be liberally construed in light of its prime purpose, the protection of employees and others by requiring the use of safe equipment." (Emphasis added.)

We must engage liberal construction in favor of protecting the employees. We construe the carrier's obligation under the Act to be dual. The carrier must maintain locomotive parts and appurtenances in proper condition and must maintain the locomotive in such a condition as to prevent unnecessary peril to life or limb. The railroad in this case was obligated under the Act to perform both duties and its failure in either regard rendered it in violation. Here the undisputed facts show that the spot welds were broken; therefore parts and appurtenances were not in proper condition. The trial court was entitled to find a violation of the Act from the existence of broken spot welds without more.

The trial court properly left the question of causation to the jury. The jury was correctly instructed that BN violated the Act but before the jury could find for the plaintiff they must find that the defective welds caused an accident injuring Dallas. We find the trial court properly interpreted and applied the federal law.

BN contends that plaintiff's medical evidence was not sufficiently certain to be admissible. BN further argues that the medical testimony is so speculative that it failed to provide a basis for consideration of permanent impairment to earning capacity.

Dallas primarily relied upon the testimony of Dr. Peter V. Teal, the orthopedic surgeon, and Dr. Robert D. Schimpff, the neurologist.

The thrust of BN's argument is that these two doctors were unable to pinpoint the exact etiology of Dallas' injury. Certainly the record does not support a finding that Dallas suffered from a herniated disc. On cross-examination, Dr. Teal testified as follows:

"Q. So it is not your opinion then, to any reasonable degree of medical certainty, that his problems, his complaints are due to an injury of the disc in the spine?

"A. No, I cannot say with any reasonable degree of medical certainty that he injured his disc in his spine."

Dr. Schimpff testified that Dallas' injury was one of three things: (1) a soft tissue injury (2) a thoracic outlet syndrome (3) a herniated disc. Dr. Schimpff was unable to determine which of the three conditions was producing symptoms.

There is abundant medical testimony in the record to support Dallas' claim of injury. That claim does not fail because of the doctors' uncertainty about the type of injury involved. Many of the symptoms produced by the three described etiologies are similar. The doctors agreed that the plaintiff was injured as the result of the trauma suffered in the accident. That is sufficient.

BN contends there is insufficient evidence of permanency. With respect to evidence of permanent injury the following questions, objections and answer are taken from the record:

"Q. Do you feel that his present condition then and restrictions from that condition are permanent?

"MR. KOOLEN: Objection is leading.

"In your opinion, are then his present limitations permanent?

"MR. KOOLEN: Objection.

"THE COURT: I will let him answer that.

"Q. Let me re-ask the question. Based upon your examinations and treatment of Mr. Dallas over the length of time that you have described, in your opinion that his condition is stabilized, do you have an opinion whether his condition is going to get any better in the future?

"A. Based on the fact that I have not seen many changes in his condition over the last many months, I don't see any indication, any medical indication that would suggest that he would enter into a recovery period. Being an optimist as I am, I would hope that he would enter into a recovery period but I think we have adopted measures which allow him to exist productively although with intermittent discomfort and I don't really expect that to change."

We agree with BN that the answer given by Dr. Schimpff is not strong and clear. This Court has generally adhered to a test of "reasonable medical certainty" as the basis for admissibility although we do not require of doctors the same strictness in testifying that was once required. See Stordahl v. Rush Implement Company (1966), 148 Mont. 13, 417 P.2d 95. Although we still formally adhere to a "reasonable medical certainty" standard, the term is not well understood by the medical profession. Little, if anything, is "certain" in science. The term was adopted in law to assure that testimony received by the fact finder was not merely conjectural but rather was sufficiently probative to be reliable. We are striving for, what in fact, is a probability rather than a possibility. Our evidentiary standards are satisfied if medical testimony is based upon an opinion that it is "more likely than not." We find that Dr. Schimpff's testimony regarding "permanency" was sufficient for the jury to find it probable that Dallas' present symptomatic condition would not improve during his lifetime.

8

BN contends that the trial court erred in refusing to instruct the jury on the nontaxability of any award made by the jury. BN relies upon the United States Supreme Court case of Norfolk and Western RR v. Liepelt (1980), 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689. The Supreme Court held it was reversible error to fail to instruct on the nontaxability of the award where a jury, in a wrongful death case, awarded more than twice the amount plaintiff's proof showed for loss of support. The court was convinced that the jury had added to the award an amount for claimant to be able to satisfy an income tax obligation on the award. The court said:

> "'[t]o put the matter simply, giving the instruction can do no harm, and it can certainly help by preventing the jury from inflating the award and thus overcompensating the plaintiff on the basis of an erroneous assumption that the judgment will be taxable.'" (citations omitted.) 444 U.S. at 498.

In Flanagan v. Burlington Northern, Inc. (8th Cir. 1980), 632 F.2d 880, Chief Judge Donald P. Lay, writing for the Court, distinguished Flannagan from Liepelt. In Flannagan the jury, unlike the jury in Liepelt, had not awarded an amount clearly in excess of plaintiff's proven damage figure. Judge Lay said:

> ". . . the prejudicial effect of a failure to give a nontaxability instruction should be decided on the existence of evidence that the jury did, in fact, operate under a false impression of the tax laws." Flanagan, 632 F.2d at 890.

In addressing the Liepelt decision, the opinion said:

> ". . . The Liepelt jury awarded the plaintiff $775,000 whereas the plaintiff's own economist testified to lost earnings of only $302,000. This large disparity between the evidence and the verdict greatly influenced the Supreme Court in deciding that the failure of the trial court to give a nontaxability instruction was prejudicial error." Id.

In this case the jury awarded $477,000 which was the exact figure projected by the economist for lost wages and loss of earning capacity. This jury clearly did not award a

9

sum for some future tax obligation. Therefore, any error in failing to give a nontaxibility instruction is harmless.

BN claims error in admitting rebuttal testimony from a witness not noticed. However BN produced a witness, not previously noticed as an expert, to testify that freight locomotives do not vibrate unduly. Such testimony was offered to refute plaintiff's claimed inability to work. To rebut this plaintiff offered testimony from a witness not previously disclosed. The testimony vividly demonstrated the vibration characteristics of a freight locomotive. The testimony was rebuttal. No statute or rule mandates notice. There was no court order requiring notice. Notice was not required.

BN also argues that the testimony offered by the rebuttal witness should have been introduced in plaintiff's case in chief. Admission of rebuttal testimony invokes the discretion of the trial court. McGee v. BN (1977), 174 Mont. 466, 571 P.2d 784, 792. We find no abuse of discretion in this case.

Finally, BN argues the verdict was excessive. Dallas testified that his injury and consequent pain reduced his mileage by 30%. Locomotive engineers are paid by the mile. Based upon this testimony an economist projected loss of future earning capacity at $415,000. Lost earnings to date of trial were $62,000. The total was $477,000, the exact amount of the jury's award.

The award is large considering that the medical testimony only supports a permanent soft tissue injury in the neck and back. However, the testimony showed that Dallas earned $1.08 per mile and, without injury, averaged more than 4,000 miles per month. An annual income of $50,000, diminished by 30%, represents a very significant loss of earning capacity. The economist's projection was based upon this evidence and supports the jury's award.

10

The only uncontroverted fact, the existence of defective spot welds, was removed from the jury. All controverted facts were submitted to the jury under proper instructions. The jury resolved nearly all factual controversies in favor of Dallas which they were entitled to do. We find no error. The judgment in favor of Dallas is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices