DA 08-0215

FILED

July 22 2009

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 245

B.J. and J.J., Individually and on behalf
of E.J., a minor,

      Plaintiffs and Appellants,

    v.

KEITH SHULTZ, M.D., GARY MERMEL, M.D.;
ANESTHESIA PARTNERS OF MONTANA,

      Defendants and Appellees.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 06-0306
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

          Monte D. Beck, John Lyman Amsden; Beck & Amsden PLLC;
Bozeman, Montana

      For Appellees:

          Gary Kalkstein; Kalkstein & Johnson, P.C.; Missoula, Montana
(for Gary Mermel, M.D.)

          John J. Russell; Brown Law Firm, P.C.; Billings, Montana
(for Keith Shultz, M.D.)

          Mark S. Williams; Missoula, Montana
(for Anesthesia Partners of Montana, P.C.)

                Submitted on Briefs:  March 4, 2009

                         Decided:  July 21, 2009

Filed:

_____
                     Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 B.J., J.J., and E.J. (collectively "the J.'s") appeal the order of the Thirteenth Judicial District Court, Yellowstone County, granting summary judgment in favor of Keith Shultz, M.D., Gary Mermel, M.D., and Anesthesia Partners of Montana (collectively "the AP defendants") on the J.'s medical negligence claim. The J.'s also appeal the District Court's decision to allow the AP defendants to proceed with a non-party defense under § 27-1-703, MCA. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In June, 2005, the J.'s entered Saint Vincent Hospital to deliver twins. At approximately 3:36, J.J. (the mother) requested a spinal epidural.[1] Dr. Shultz was paged, and administered the epidural. Before leaving J.J.'s birthing suite, Dr. Shultz and Dr. Dahl (the J.'s Obstetrician) agreed that Dahl would notify Shultz when J.J. entered Stage II of labor and moved to the operating room for delivery. (Because of the increased potential of complications requiring an emergency cesarean section (c-section) during twin deliveries, hospital protocol required that all twin deliveries take place in an operating room.) The accepted standard of care and AP policy required that an anesthesiologist be "physically present" or "available immediately in the presence of the mother" at Stage II of labor for all twin births. Therefore, it is standard procedure that an anesthesiologist is paged when the laboring mother is moved to the operating room,

---

[1] For the sake of clarity, all times referenced in this opinion correspond to the timing on the hospital clock, which is approximately three minutes slower than the pager log. Pager log times will be given in parentheses where appropriate. Furthermore, all times in this Opinion refer to p.m.

2

whether or not the need for their services has arisen. Due to an internal communication error between Dr. Dahl and the unit clerk, Dr. Shultz was not paged when J.J. was moved to the operating room at approximately 4:48.

¶3 Dr. Shultz was the "first call" anesthesiologist on the day J.J. was in labor. As first call anesthesiologist, Shultz was responsible for directing the other on-call anesthesiologists to the various places they were needed. The hospital staff, including the labor and delivery ward, was provided the name of the first and second call anesthesiologist each day. It was standard protocol that hospital staff would page the first call anesthesiologist when an anesthesiologist was needed, and he would determine which anesthesiologist reported for that procedure. However, the second call anesthesiologist's pager number was provided to the labor and delivery staff in the event the first call anesthesiologist did not respond to the page. On the day in question, Dr. Reitz was the second call anesthesiologist, and Dr. Mermel was the fourth call anesthesiologist.

¶4 When J.J. was moved to the operating room for delivery, Dr. Shultz was not attending a procedure. It was AP's policy that the fourth call doctor, here Dr. Mermel, had the option of having the first call doctor relieve him in whatever procedure he was attending. The fourth call doctor would then cover the labor and delivery ward. It was AP's policy that the anesthesiologist covering labor and delivery could leave the hospital, so long as he could return to the hospital within a half hour of being paged. Dr. Mermel therefore chose to have Dr. Shultz relieve him in a complex back surgery. Dr. Shultz

relieved Dr. Mermel at approximately 5:10, and gave him the status of the patients in labor and delivery, including J.J. Several laboring mothers had epidurals administered, including J.J. Dr. Mermel left the hospital at approximately 5:25, without personally checking the status of the laboring mothers with epidurals administered. The second call doctor, Reitz, came out of surgery at approximately 5:06, and was in the doctors' lounge thereafter.

¶5     J.J. uneventfully delivered the first twin at approximately 5:06. A few minutes later, the second twin's cord prolapsed. A prolapsed cord can become an obstetric emergency requiring a c-section. At approximately 5:18 (5:21), the labor and delivery staff placed a page to Dr. Shultz, to which he did not respond. Shultz maintains he did not receive the page. Although the labor and delivery staff was provided with the second call doctor's pager number in the event the first call doctor did not promptly respond to a page, they did not call Dr. Reitz when Dr. Shultz failed to respond to the page. Rather, the staff waited approximately seven minutes, and paged Dr. Shultz again, at 5:25 (5:28). Shultz did receive this page. There is varying testimony regarding whether the labor and delivery staff conveyed a sense of urgency to Shultz at that time—Shultz maintains he assumed the 5:28 page was simply to inform him that J.J. had moved into the operating room for delivery. Shultz contacted Mermel at approximately 5:26 (5:29), and they agreed Mermel would return to the hospital. At 5:30 (5:33), Dr. Dahl began an emergency c-section, without anesthesia present. At 5:31 (5:34), the labor and delivery staff paged Dr. Reitz, who had been in the doctors' lounge since he came out of a surgery

4

at 5:06. He administered anesthesia to J.J. approximately two minutes after receiving the page. The second twin was born with severe brain damage, including cerebral palsy, related to prolonged hypoxia resulting from the prolapsed cord.

¶6 The J.'s filed suit against the hospital, Dr. Dahl and her practice group, and Dr.'s Shultz and Mermel and their practice group, AP, alleging medical negligence. The AP defendants raised two relevant affirmative defenses: 1) that the J.'s injury was due to acts or events unrelated to the care and treatment provided by AP; and 2) that AP has "rights and remedies under § 27-1-703, MCA, regarding persons who have settled with Plaintiffs." Approximately 10 months before trial, Dr. Dahl and her practice group offered to settle with the J.'s for full insurance policy limits. The J.'s accepted the offer on the eve of trial, and therefore withdrew their expert obstetrician. The District Court allowed AP to proceed with a non-party claim under § 27-1-703, MCA, over the J.'s objection, ruling that it would allow the jury to consider Dr. Dahl's conduct when allocating fault among the parties. The court vacated the trial date, and re-opened discovery in order to allow AP to conduct additional discovery and designate experts to support their settled party defense. The J.'s sought a writ of supervisory control from this Court, seeking reversal of the District Court's decision allowing AP to pursue a non-party defense. We declined to exercise supervisory control.

¶7 Just prior to trial, upon AP's motion for reconsideration, the District Court granted summary judgment in favor of AP, concluding the J.'s expert anesthesiologist (Dr. Sheren) failed to establish that the anesthesiologists deviated from any applicable

5

standard of medical care. The District Court also concluded Dr. Sheren's deposition testimony did not create issues of material fact sufficient to preclude summary judgment. This appeal followed.

¶8 We restate the issues on appeal as follows:

¶9 Did the District Court err in granting summary judgment to the AP defendants?

¶10 Did the District Court err in its application of § 27-1-703, MCA, or in the alternative, is the statute unconstitutional as applied?

## STANDARD OF REVIEW

¶11 We review a district court's summary judgment ruling de novo. *Town and Country Foods, Inc., v. City of Bozeman*, 2009 MT 72, ¶ 12, 349 Mont. 453, 203 P.3d 1283. We review a district court's rulings on discovery motions and trial scheduling for abuse of discretion. *In re S.C.*, 2005 MT 241, ¶ 16, 328 Mont. 476, 121 P.3d 552. To the extent the court's rulings are based on statutory interpretation, our review is de novo. *In re C.D.H.*, 2009 MT 8, ¶ 21, 349 Mont. 1, 201 P.3d 126.

## DISCUSSION

¶12 Did the District Court err in granting summary judgment to the AP defendants?

¶13 In order to survive a motion for summary judgment in a negligence action, the plaintiff must raise genuine issues of material fact with regard to a legal duty on the part of the defendant, breach of that duty, causation, and damages. *Butler v. Domin*, 2000 MT 312, ¶ 21, 302 Mont. 452, 15 P.3d 1189. In a cause of action alleging medical malpractice, the plaintiff must produce expert medical testimony establishing the

applicable standard of care and departure from that standard. *Butler*, ¶ 21. The J.'s presented Dr. Sheren's expert medical opinion for the purpose of establishing that the AP defendants' deviation from seven different standards of care contributed to the J.'s injuries. The District Court found that Dr. Sheren's deposition testimony failed to establish that the AP defendants breached a national standard of care, thus summary judgment was appropriate as a matter of law.

¶14 Assuming arguendo that Sheren's deposition testimony suffices to establish the various national standards of care, importantly, Dr. Sheren's opinion that the AP defendants deviated from the applicable standards was premised on the assumption that there was not an anesthesiologist "immediately available" to the J.'s after J.J.'s epidural was administered.[2] We therefore agree with the District Court that the undisputed facts

---

[2] Although the AP defendants argue that the J.'s cannot rely on Dr. Sheren's revised post summary judgment affidavit to establish expert opinions regarding the AP defendants breach of various standards of care, for sake of discussion, we consider Dr. Sheren's opinions as set forth in the J.'s briefing to this Court:

1. In twin birth cases, once an epidural has been administered, the standard of care requires immediate availability of an anesthesiologist.
2. If an anesthesiologist covering [labor and delivery] intends to leave the hospital while multiple women have epidurals administered, the standard of care requires that he first personally obtain recent information about their status.
3. Shultz breached the standard of care and caused injury to Plaintiffs when he failed to notify [labor and delivery] staff that he was leaving the floor after placing J.J.'s epidural.
4. Shultz breached the standard of care and caused injury to Plaintiffs by allowing Mermel to leave [the hospital] without taking any steps to determine the current condition of J.J., the other laboring mothers with epidurals administered, or the status of the [labor and delivery] operating rooms.
5. Mermel breached the standard of care and caused injury to Plaintiffs when he left the hospital without rounding on [labor and delivery].
6. Shultz and Mermel breached the standard of care when Mermel left the hospital while Defendants were unaware of any other anesthesiologist who could provide "immediately available" coverage to [labor and delivery].
7. AP breached the standard of care and caused injury to Plaintiffs by having a policy allowing doctors to leave [the hospital] without taking any steps to determine the current condition of laboring mothers, by failing to establish protocols for the anesthesiologist covering [labor and delivery], and by allowing Shultz and Mermel to shift responsibility for coverage of [labor and delivery] without notifying hospital staff of the change in plans.

7

show there was no breach of any standard of care for failure to have an anesthesiologist immediately available at all relevant times.

¶15　Dr. Shultz was available from approximately 3:50, when he left J.J.'s room after administering an epidural, until approximately 5:10, when he relieved Dr. Mermel in a complex back surgery. Dr. Mermel was available from 5:10 until 5:25, when he left the hospital. Dr. Reitz was in the doctors' lounge from approximately 5:06 until he responded to the emergency page from labor and delivery at approximately 5:31 (5:34). Therefore, it is undisputed that there was at least one anesthesiologist available from the time J.J. was administered an epidural through the birth of the second twin.

¶16　The J.'s argue that after Dr. Mermel left the hospital at 5:25, there was not an anesthesiologist "immediately available." While the J.'s acknowledge that Dr. Reitz was physically available, they contend that because he was not assigned to cover labor and delivery, his availability was fortuitous, and thus legally insignificant. However, the record contradicts the J.'s characterization of Dr. Reitz's availability.

¶17　The following critical facts regarding Reitz's availability remain undisputed. While anesthesia should have been paged at 4:48, when Mrs. J. entered Stage II of labor and was moved to the operating room, Dr. Shultz was not paged until 5:18 (5:21). He did not respond to this page. Standard practice dictated that because Dr. Shultz did not promptly respond to the page, the staff should have paged the second call anesthesiologist, Dr. Reitz. Had the hospital staff done so, Dr. Reitz would presumably have responded to that page within two minutes (as he did when he was finally paged).

8

Therefore, he would have arrived at the operating room well before Dr. Dahl began the c-section on Mrs. J.

¶18 Ultimately, between 4:48, when Mrs. J. was moved into the operating room, up until and through the delivery of the second twin, there were at least one, if not two anesthesiologists on hospital grounds and immediately available. Dr. Shultz was at the hospital and available until 5:10, and Dr. Mermel was at the hospital and available from 5:10 until 5:25. Given that Dr. Reitz was the designated second call anesthesiologist, and that it is undisputed that he was available as of 5:06, as a matter of law, the AP defendants provided "immediately available" anesthesiology services to the J.'s.

¶19 The J.'s aptly argue that notwithstanding Reitz's availability, there remain disputed issues of fact regarding whether Shultz received the initial 5:18 (5:21) page; whether the hospital staff conveyed the urgency of the situation in the subsequent page; whether Shultz's response was appropriate given the urgency; and whether Dr. Mermel had appropriately updated information on the patients in labor and delivery; among others. However, those factual disputes are not material given that an anesthesiologist was immediately available at all relevant times.

¶20 We therefore affirm the District Court's determination that the J.'s failed to produce expert testimony establishing the AP defendants' breach of any applicable standard of medical care. Because we affirm the District Court's grant of summary judgment, the J.'s action against the AP defendants is no longer viable. Thus, we need not determine whether the District Court properly applied § 27-1-703, MCA.

9

¶21    Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ MIKE McGRATH
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE