DA 11-0618

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 260

TONY BEEHLER, individually and as Co-representative
of the Estate of Katherine Ann Beehler-Goodson;
ROBERT GOODSON, individually and as Co-representative
of the Estate of Katherine Ann Beehler-Goodson, and
as natural guardian and next friend of E.G. and R.G., minors,

        Plaintiffs and Appellants,

  v.

EASTERN RADIOLOGICAL ASSOCIATES, P.C.; ANNE
GIULIANO, M.D.; and ST. VINCENT HEALTHCARE,

        Defendants and Appellees.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 10-648
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

            John L. Amsden (argued), Justin P. Stalpes, Beck & Amsden, PLLC,
Bozeman, Montana

        For Appellees:

            Julie A. Lichte (argued), Kiely Keane, Christopher K. Olivereira, Crowley
Fleck, PLLP, Bozeman, Montana (Eastern Radiological Assoc.)

            Robert C. Brown (argued), Charles K. Smith, Poore, Roth & Robinson,
P.C., Butte, Montana (St. Vincent Healthcare)

Argued: August 1, 2012
Submitted: August 15, 2012
Decided: November 13, 2012

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 Plaintiffs Tony Beehler ("Tony"), individually and as a co-representative of the Estate of Katherine Ann Beehler-Goodson, and Robert Goodson ("Robert"), individually and as a co-representative of the Estate and as natural guardian and next friend of E.G and R.G., minors,[1] appeal an order from the Thirteenth Judicial District Court, Yellowstone County, granting Defendants' Eastern Radiological Associates ("ERA"), Dr. Anne Giuliano ("Dr. Giuliano"), and St. Vincent Healthcare ("SVH")[2] motion for summary judgment. We reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Katherine Beehler-Goodson ("Katherine") was the mother of minor children E.G. and R.G., the wife of Robert, and the sister of Tony. Prior to 2009, Katherine had suffered various back injuries. Katherine sought surgery in 2009 to address persistent pain resulting from these injuries. In preparation for surgery, Katherine saw Dr. Giuliano, a board certified radiologist associated with ERA, for a myelogram. A myelogram is a radiological procedure where a needle is used to inject dye into the sac surrounding the spine to help reveal the bones, nerves, and fluid filled spaces in an X-ray. As a radiological procedure, a myelogram consists of procedures, such as X-rays and the analysis thereof, which are not pertinent to this case. For our purposes, the only relevant portion of the myelogram consists of the infection control procedures taken preceding and surrounding the insertion of the myelogram needle into Katherine's spinal column

---

[1] When speaking collectively, we will refer to Tony, Robert, and the Estate as "Plaintiffs."
[2] When speaking collectively, we will refer to Dr. Giuliano, ERA, and SVH together as "Defendants."

2

and the subsequent injection of a dye into Katherine's cerebrospinal fluid ("CSF"). The further administration of radiological procedures is not at issue and was not raised by Plaintiffs at the District Court or on appeal.

¶3 Dr. Giuliano performed the myelogram on Katherine on June 17, 2009, in a radiology suite at SVH. Dr. Giuliano did not wear a mask during the procedure, including while she prepared the needle and inserted it into Katherine's spinal column. Both parties agree Dr. Giuliano was the only person within the zone of oral droplet transmission surrounding Katherine during the critical portions of the myelogram. Following the procedure, Katherine was discharged without complication and returned to her hotel room to rest. Later that evening, Katherine developed a headache and nausea and returned to SVH, where she was admitted to the SVH Emergency Room and diagnosed with spinal meningitis. The time between the procedure and the diagnosis was roughly 12 hours. Spinal meningitis is a bacterial infection of the membranes (meninges) covering the spinal cord. Laboratory work determined that the bacteria that caused the infection were Group B Streptococci ("GBS"). The parties agree that the GBS bacteria were introduced into Katherine's CSF when the myelogram needle entered her spinal column. Katherine died as a result of the meningitis infection on June 20, 2009.

¶4 Plaintiffs filed a medical malpractice claim against the Defendants on April 8, 2010, alleging, *inter alia*, that "Defendants failed to adhere to proper infection control measures," thereby negligently causing Katherine's meningitis infection. In particular, Plaintiffs alleged Dr. Giuliano negligently failed to wear a mask during the myelogram, causing Katherine's infection. Regarding SVH, Plaintiffs alleged that the hospital had a

3

duty to promulgate infection control policies that specifically required wearing a mask during a myelogram. Plaintiffs claimed that SVH's failure to do so caused Katherine's infection.

¶5 Following extensive discovery and briefing, Defendants filed motions *in limine* on August 19, 2011, attacking, *inter alia*, the qualifications of Plaintiffs' proposed expert witness, Dr. Patrick Joseph, MD, ("Dr. Joseph"). The Defendants opposed Dr. Joseph's qualification as an expert witness on the appropriate standards of care, departure from those standards, and causation. Defendants sought to cast the subject matter of Plaintiffs' malpractice claim as specifically concerning myelograms performed by radiologists, not the infection prevention procedures taken surrounding the insertion of the needle into Katherine's spinal column. With regards to the relevant standards of care, Defendants essentially claimed that Dr. Joseph was not qualified to testify as an expert under § 26-2-601, MCA, because he is not a radiologist and does not perform myelograms. Regarding causation, Defendants argued that Dr. Joseph's testimony lacked a scientific basis and did not establish that it was more likely than not that the GBS bacteria traveled from Dr. Giuliano's uncovered mouth into Katherine's spinal column.

¶6 Defendants concurrently filed motions for summary judgment on the standard of care and causation, alleging that if Plaintiffs' sole expert witness on the standard of care, breach, and causation was not qualified, judgment was appropriate as a matter of law. *See Montana Deaconess Hosp. v. Gratton*, 169 Mont. 185, 189, 545 P.2d 670 (1976). The District Court held a hearing on Defendants' motions on September 22, 2011, and granted summary judgment on the standard of care and causation on October 11, 2011.

4

¶7 In its summary judgment order, the court found that Dr. Joseph was not qualified to offer expert testimony on the applicable standards of care, breach, or causation. The court found that "the requisite qualifications for expert witnesses in medical malpractice cases are set forth in Mont. Code Ann. § 26-2-601," and that because Dr. Joseph was not a board certified radiologist, he "cannot give an opinion regarding Dr. Giuliano's duty based on board certified radiological standards."

¶8 Respecting SVH, the court found that "[t]he standards of care for a given specialty still control," and focused on Dr. Joseph's use of a 2007 Centers for Disease Control and Prevention ("CDC") publication recommending masks during myelograms. The court found that because "the CDC does not impose requirements on healthcare providers," neither its recommendations nor Dr. Joseph's use of them could establish a hospital's standard of care.

¶9 As to Dr. Joseph's proposed opinion on causation, the court found that Dr. Joseph's testimony did not meet the necessary standard for expert medical opinion testimony. In so holding, the court applied M. R. Evid. 702 and our requirement that medical expert testimony be based upon a "more likely than not" standard. *See Dallas v. Burlington N. Inc.*, 212 Mont. 514, 523, 689 P.2d 273 (1984).

¶10 Without Dr. Joseph's expert testimony, the court found Plaintiffs lacked the necessary expert witness to establish the elements of medical negligence, making summary judgment for the Defendants appropriate as a matter of law. *See Seal v. Woodrows Pharm.*, 1999 MT 247, ¶ 35, 296 Mont. 197, 988 P.2d 1230.

¶11 This appeal followed, and we held oral argument on August 1, 2012.

## STATEMENT OF THE ISSUES

¶12 We restate the issues on appeal as follows:

¶13 1. Did the District Court err by excluding Dr. Joseph's expert testimony on Dr. Giuliano's and SVH's standard of care?

¶14 2. Did the District Court err by excluding Dr. Joseph's expert testimony on causation?

¶15 3. Did the District Court err by granting the Defendants' motion for summary judgment?

¶16 4. Did the District Court err in granting costs for depositions?

## STANDARD OF REVIEW

¶17 A district court's evidentiary rulings are reviewed for an abuse of discretion. *State v. Wilmer*, 2011 MT 78, ¶ 11, 360 Mont. 101, 252 P.3d 178. This includes rulings on the admissibility of expert testimony. *Norris v. Fritz*, 2012 MT 27, ¶ 17, 364 Mont. 63, 270 P.3d 79. We do not simply determine whether this Court would have made the same ruling, but determine "whether the district court 'acted arbitrarily without conscientious judgment or exceeded the bounds of reason' and prejudiced a substantial right of the appellant." *Weber v. BNSF Ry. Co.*, 2011 MT 233, ¶ 39, 362 Mont. 53, 261 P.3d 984. A district court's application of a statute is reviewed to determine whether it was correct. *Blackmore v. Dunster*, 2012 MT 74, ¶ 6, 364 Mont. 384, 274 P.3d 748. We review summary judgment rulings de novo. *Estate of Wilson v. Addison*, 2011 MT 179, ¶ 11, 361 Mont. 269, 258 P.3d 410 (citing *Goettel v. Estate of Ballard*, 2010 MT 140, 356 Mont. 527, 234 P.3d 99). In the course of this analysis we apply the same M. R. Civ. P.

6

56 criteria as the district court to determine "whether the moving party has established both the absence of any genuine issues of material fact and entitlement to judgment as a matter of law." *Wilson*, ¶ 11.

## DISCUSSION

¶18 Initially, "[i]n order to survive a motion for summary judgment in a negligence action, the plaintiff must raise genuine issues of material fact with regard to a legal duty on the part of the defendant, breach of that duty, causation, and damages." *B.J. v. Shultz*, 2009 MT 245, ¶ 13, 351 Mont. 436, 214 P.3d 772 (citing *Butler v. Domin*, 2000 MT 312, ¶ 21, 302 Mont. 452, 15 P.3d 1189). With respect to medical malpractice claims in particular, the plaintiff must generally produce expert medical testimony establishing the applicable standard of care and a subsequent departure from that standard.[3] *Butler*, ¶ 21. We have repeatedly recognized that a plaintiff's failure to provide this expert testimony "is fatal to the plaintiff's claim." *Griffin v. Moseley*, 2010 MT 132, ¶ 31, 356 Mont. 393, 234 P.3d 869 (citing *Montana Deaconess Hosp. v. Gratton*, 169 Mont. 185, 189, 545 P.2d, 670, 672 (1976)).

¶19 Plaintiffs may not meet these requirements by offering CDC recommendations after their lone expert has been excluded. Even assuming, *arguendo*, that such CDC recommendations can set infection control standards of care, we require expert testimony to establish the standard of care and breach. *Griffin*, ¶ 31; *Butler*, ¶ 21. Likewise, Plaintiffs may not establish genuine issues of material fact with an attorney's affidavit.

---

[3] The exception to this rule allowing lay testimony where the conduct complained of is readily ascertainable to a layman has not been raised and does not apply in cases of infection. *See Dalton v. Kalispell Regional Hosp.*, 256 Mont. 243, 246, 846 P.2d 960 (1993).

7

M. R. Civ. P. 56(e); *Hiebert v. Cascade County*, 2002 MT 233, ¶¶ 29-30, 311 Mont. 471, 56 P.3d 848; *Morales v. Tuomi*, 214 Mont. 419, 424, 693 P.2d 532 (1985). As we have repeatedly found, Plaintiffs must present expert testimony to survive a motion for summary judgment. Accordingly, determining whether the District Court abused its discretion by excluding Dr. Joseph's testimony will resolve this appeal.

¶20     *1. Did the District Court err by excluding Dr. Joseph's expert testimony on Defendants' standards of care?*

¶21     *A. Is Dr. Joseph qualified to testify as an expert witness on Dr. Giuliano's standard of care under § 26-2-601, MCA?*

¶22     To support their claim that Defendants breached the applicable standard of care and caused Katherine's death, Plaintiffs sought to proffer the expert testimony of Dr. Joseph. Indeed, Dr. Joseph was the only expert Plaintiffs offered to establish the standard of care, breach, or causation. Dr. Joseph is not a radiologist, but he is board certified in Internal Medicine, Infectious Diseases, Epidemiology, Medical Management, and Quality Assurance. Infection preventionists such as Dr. Joseph are specifically trained to prevent nosocomial (acquired in the hospital) infections. In this role, Dr. Joseph has investigated post-myelogram meningitis. Dr. Joseph is also the Chief of Infectious Disease for a physician group, develops and reviews policies for preventing hospital-born infection as the Chair of a hospital Infection Control Committee, and performs procedures involving lumbar punctures, but not myelograms. Thus, Dr. Joseph has training and experience in the infection and infection control policies at issue.

8

¶23 Despite Dr. Joseph's evident qualifications in the field of infection prevention, the seeming subject of Plaintiffs' negligence claim, the court excluded Dr. Joseph's testimony regarding Dr. Giuliano's standard of care based on its application of § 26-2-601, MCA. In particular, the court found that because Dr. Joseph was not a radiologist and had never performed a myelogram, he was not qualified under § 26-2-601, MCA, to testify on either the applicable standard of care or any departure from that standard. Section 26-2-601, MCA, enacted in 2005 and effective that year, established qualifications for medical malpractice expert witnesses. As a result, it must be considered in conjunction with a district court's admission of expert testimony pursuant to M. R. Evid. 702. Rule 702 requires that expert witnesses be qualified by way of "knowledge, skill, experience, training, or education." M. R. Evid. 702. We have encouraged trial courts to "construe liberally the rules of evidence so as to admit all relevant expert testimony" when presented with scientific evidence. *State v. Damon*, 2005 MT 218, ¶¶ 17-19, 328 Mont. 276, 119 P.3d 1194 (2005). This is done with the understanding that " 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " *Hulse v. DOJ, Motor Vehicle Div.*, 1998 MT 108, ¶ 62, 289 Mont. 1, 961 P.2d 75 (quoting *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786 (1993)).[4]

---

[4] While *Daubert* was limited to a court's consideration of novel scientific evidence, its rationale for the liberal admission of scientific evidence "is wholly consistent with our decision in [*Barmeyer v. Montana Power Co.*, 202 Mont. 185, 657 P.2d 594 (1983), overruled on other grounds by *Martel v. Montana Power Co.*, 231 Mont. 96, 752 P.2d 140 (1988)] concerning the admissibility of scientific evidence in general." *Hulse*, ¶ 63.

¶24 While we have not previously considered the effect of § 26-2-601, MCA, it adds to Rule 702's foundational requirements when courts consider medical malpractice experts, stating:

(1) A person may not testify as an expert witness on issues relating to negligence and standards of care and practice in an action on a malpractice claim, as defined in 27-6-103, for or against a health care provider, as defined in 27-6-103, unless the person:

(a) is licensed as a health care provider in at least one state and routinely treats or has routinely treated within the previous 5 years the diagnosis or condition or provides the type of treatment that is the subject matter of the malpractice claim or is or was within the previous 5 years an instructor of students in an accredited health professional school or accredited residency or clinical research program relating to the diagnosis or condition or the type of treatment that is the subject matter of the malpractice claim; and

(b) shows by competent evidence that, as a result of education, training, knowledge, and experience in the evaluation, diagnosis, or treatment of the disease or injury that is the subject matter of the malpractice claim against the health care provider, the person is thoroughly familiar with the standards of care and practice as they related to the act or omission that is the subject matter of the malpractice claim on the date of the incident upon which the malpractice claim is based.

(2) If the malpractice claim involves treatment that is recommended or provided by a physician as defined in 37-3-102, a person may not testify as an expert witness with respect to issues of negligence or standards of care and practice concerning the treatment unless the person is also a physician.

(3) A person qualified as an expert in one medical specialty or subspecialty is not qualified to testify with respect to a malpractice claim against a health care provider in another medical specialty or subspecialty unless there is a showing that the standards of care and practice in the two specialty or subspecialty fields are substantially similar. This subsection (3) does not apply if the subject matter of the malpractice claim against the health care provider is unrelated to the relevant specialty or subspecialty.

Section 26-2-601, MCA.

10

¶25 Here, the court applied § 26-2-601, MCA, to exclude Dr. Joseph's testimony, determining that because he was not a radiologist, he could not testify on Dr. Giuliano's standard of care. However, Defendants and the court too narrowly conceived the subject matter of Plaintiffs' claim and, as a result, incorrectly excluded Dr. Joseph's testimony. When the specifics of Dr. Joseph's deposition and experience are applied to the requirements of § 26-2-601, MCA, and the subject of Plaintiffs' claim, it is clear that Dr. Joseph qualifies as an expert. Specifically, Dr. Joseph is licensed to practice in California, treats bacterial meningitis, and provides the type of treatment at issue, infection prevention during a myelogram, satisfying Subsection 1(a). Moreover, Dr. Joseph is board certified in infection prevention, investigates and treats nosocomial infections, has investigated post-myelogram meningitis infections, and has developed infection control procedures that require radiologists to wear masks during myelograms. Recognizing that the wearing of a mask during the myelogram is the "act or omission that is the subject matter of the malpractice claim," it is clear that Dr. Joseph satisfied Subsection 1(b). Similarly, as Dr. Joseph is a physician testifying about a physician, he satisfied Subsection 2.

¶26 Subsection 3 forbids one medical specialty testifying against another without a showing that the standards of care in the relevant specialties are "substantially similar" or that the claim's subject matter is unrelated to radiology. Here, Plaintiffs contest an infection prevention procedure that, according to Dr. Joseph, does not involve technical details particular to either radiology or myelograms. As Dr. Joseph testified, wearing a mask during a myelogram is among those infection control procedures, such as room

11

cleaning, hand washing, wearing appropriate surgical attire, and draping, that are "similar for other invasive procedures." Dr. Joseph further testified that wearing a mask applies "anytime something was injected into the spinal cord." Based on this testimony, it is evident that the infection control procedure at issue is not unique to radiology, and logically applies to other medical specialties.

¶27 Since the Plaintiffs allege that Katherine's injuries were caused by Dr. Giuliano's failure to adhere to proper infection control procedures during injection of fluid into Katherine's spinal cord, there is an intersection between the specialties of infection prevention and radiology that arises in this case. Dr. Joseph has sufficient expertise concerning the subject matter of Plaintiff's claim and the medical procedure before the court to qualify as an expert witness under § 26-2-601, MCA. Dr. Joseph demonstrated that infection prevention is not unique to any medical specialty and that he had experience in promulgating infection control standards that applied to radiologists and myelograms. From our review of Dr. Joseph's deposition, it is clear that the applicable standards of care in infection prevention and radiology, at least with regards to myelograms, are substantially similar, satisfying § 26-2-601(3), MCA. Thus, § 26-2-601, MCA, does not prevent Dr. Joseph's testimony on Dr. Giuliano's standard of care. The court's holding to the contrary was an incorrect application of the statute and an abuse of discretion.

¶28 *B.* *Is Dr. Joseph qualified to testify as an expert on SVH's standard of care*

12

*under § 26-2-601, MCA?*[5]

¶29 The court excluded Dr. Joseph's testimony on SVH's standard of care, focusing on Plaintiffs' use of both CDC recommendations and the testimony of Dr. William Rutala, MD, an infectious disease expert retained by Defendants. The court took Dr. Rutala's testimony to indicate that because the CDC recommendations did not set the standard for SVH, "SVH had no duty to require Dr. Giuliano to wear a mask during a myelogram." The court also found that radiology standards of care were not "usurped or controlled" by SVH's own policies on infection control, but that "the standards of care for a given specialty still control." On appeal, SVH primarily argues that Dr. Joseph was not qualified to testify on the hospital's standard of care because he is not a radiologist.

¶30 Again, both the court and SVH misconstrue the subject matter of Plaintiffs' claim against SVH. Plaintiffs' complaint alleges that "Defendants failed to adhere to proper infection control measures" in violation of the required standards of care. SVH correctly points out that it is not vicariously liable for any negligence by Dr. Giuliano. *See* Section 28-10-103, MCA; *Estates of Milliron v. Francke*, 243 Mont. 200, 204, 793 P.2d 824, 827 (1990). SVH argues that, given the theory of Plaintiffs' case, "without an underlying breach by the radiologist, there can be no breach by the hospital[.]" Even under SVH's theory, however, it does not necessarily follow that only a radiologist may opine on hospital-wide infection control policies. Dr. Joseph testified that "it's the role of the hospital to be sure that physicians practice appropriate infection control" and that the

---

[5] Section 26-2-601, MCA, applies to Dr. Joseph's testimony concerning SVH's standard of care by way of its application to "a health care provider, as defined in 27-6-103." Section 26-2-601(1), MCA. Section 27-6-103(3) defines "health care provider" to include "health care facility," which in turn is defined by § 27-6-103(2)(a) to include hospitals as defined by § 50-5-101(28)(a), MCA.

hospital's infection preventionist "has the obligation to investigate something that is being done which is against the recommendations of the CDC."

¶31 Plaintiffs argue that Dr. Joseph is qualified to testify on the hospital's standard of care by virtue of his training and experience as the Chair of various hospital Infection Control Committees. We agree. Dr. Joseph has a degree in medical management, is board certified in infectious diseases, and has developed hospital infection control policies for invasive procedures in radiology, meeting the requirements of § 26-2-601(1)-(2), MCA. Dr. Joseph satisfies § 26-2-601(3), MCA, due to his qualification in hospital infection prevention, the focus of Plaintiffs' claim. Indeed, Dr. Joseph opined that according to his experience and training, "every hospital should have an infection-control procedure that discusses room cleaning, hospitals should have an infection-control procedure that discusses wearing a mask, appropriate patient draping and how conduct should be done in a myelogram room." He further stated that such policies must be written and that the hospital must engage in some form of education. Dr. Joseph testified that these policies required wearing masks during myelograms in 2009 and that he had not seen a policy at SVH that applied in 2009 and met these standards. It is unclear who, if not Dr. Joseph, could qualify to testify on SVH's standard of care. He has training in infection prevention and has worked for over two decades in the specialty that forms the basis of Plaintiffs' claim against SVH. His experience and testimony directly apply to Plaintiffs' claim against SVH.

¶32 Dr. Joseph was trained and works in infection control. Plaintiffs claim SVH was negligent in promulgating insufficient infection control policies. By its own terms,

14

SVH's infection control program from 2009, which Dr. Joseph reviewed, applies to "consulting staff from all disciplines of the hospital" and patients "seeking services provided in all SVH facilities." According to the SVH infection plan for 2009, the hospital's Infection Preventionists had "the authority to initiate any appropriate Infection Prevention & Control Program or studies when it is identified there may be a danger to patients or personnel." Dr. Joseph's testimony directly contests the adequacy of this program. The court's exclusion of this testimony was an abuse of discretion and an incorrect application of § 26-2-601, MCA. An infection preventionist is surely qualified to testify on the adequacy of infection prevention policies.

¶33   *2. Did the District Court err by excluding Dr. Joseph's expert medical opinion regarding causation?*

¶34   Plaintiffs sought to qualify Dr. Joseph as an expert under M. R. Evid. 702 to establish causation. Dr. Joseph testified that Dr. Giuliano's failure to wear a mask and SVH's failure to establish policies requiring masks during myelograms caused Katherine's death. The court determined that Dr. Joseph's causation opinion was "based upon conjecture," was "speculative in nature," and "[did] not meet the 'more likely than not' standard." The court specifically faulted the lack of literature on post-myelogram meningitis caused by GBS, the lack of cases involving oral transmission of GBS, and the "90-95 percent chance that Dr. Giuliano was not colonized with GBS in her pharynx."[6] Defendants largely echo these claims on appeal.

---

[6] We note that both the court and Defendants were incorrect to conflate the rarity of meningitis or GBS in general with the specific probability of causation at issue in this case.

15

¶35 M. R. Evid. 702 permits expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." M. R. Evid. 702. The witness must be "qualified as an expert by knowledge, skill, experience, training, or education . . . ." M. R. Evid. 702. Once so qualified, the expert "may testify thereto in the form of an opinion or otherwise," M. R. Evid. 702, and medical opinions must be based on the probability that it is "more likely than not" the alleged breach caused the injury. *Addison*, ¶ 19. Additionally, "[i]n Montana, an expert's reliability is tested in three ways under Rule 702, M. R. Evid.: (1) whether the expert field is reliable, (2) whether the expert is qualified, and (3) whether the qualified expert reliably applied the reliable field to the facts." *Harris v. Hanson*, 2009 MT 13, ¶ 36, 349 Mont. 29, 201 P.3d 151. The last question is for the finder of fact. *Harris*, ¶ 36.

¶36 Here, Dr. Joseph is board certified in infectious diseases and epidemiology. These are recognized fields of scientific study and Dr. Joseph's board certifications qualify him as an expert. Dr. Joseph expressed the opinion that Dr. Giuliano's failure to wear a mask was the "most likely" cause of Katherine's meningitis. Specifically, Dr. Joseph testified that Dr. Giuliano's throat was the most likely source of the GBS bacteria, and that the failure to wear a mask allowed the GBS to travel from Dr. Giuliano's throat to Katherine's CSF when the needle was inserted into her spinal column. Dr. Joseph based this opinion on his decades of experience in infection prevention and epidemiology, his analysis of cases involving post-myelogram meningitis, and the specific circumstances of Katherine's infection. However, the court seemed to take issue with Dr. Joseph's use of

16

what it regarded as suspect terminology. In particular, the court cited Dr. Joseph's statements that GBS meningitis following a myelogram is "rare times rare," that science can only "speculate" as to how, exactly, a bacterium travels from the oral pharynx into the CSF, and his use of "suspicion" while discussing how the GBS bacteria entered Katherine's CSF. Based on these statements, the court concluded that Dr. Joseph's testimony on causation failed to meet the requirements of M. R. Evid. 702 and was not based on a "reasonable medical certainty."

¶37 Regarding Dr. Joseph's word choice, we must not let scrutiny of an expert's phrasing cloud the substantive appraisal of their testimony. *Ford v. Sentry Cas. Co.*, 2012 MT 156, ¶ 42, 365 Mont. 405, 282 P.3d 687. It is well-noted that doctors are not lawyers and imposing strict legal terminology requirements improperly places form over substance. We have previously found that "the probative force of the opinion 'is not to be defeated by semantics if it is reasonably apparent that the doctor intends to signify a probability supported by some rational basis.' " *Ford*, ¶ 42 (quoting *Miller v. Natl. Cabinet Co.*, 8 N.Y.2d 277, 168 N.E.2d 811, 813, 204 N.Y.S.2d 129 (1960)). Dr. Joseph's use of "speculate" or "suspicion" does not defeat the probative value of his opinion.

¶38 Recognizing this focus on substantive reliability, it is apparent that Dr. Joseph's opinion on causation, while not phrased in precise legal terms, met the more likely than not standard. Dr. Joseph clearly stated that he believed it was "most likely," a statement of probability, that Dr. Giuliano was the source of the GBS and that the failure to wear a mask was the cause of Katherine's meningitis. Indeed, when asked whether the GBS

17

"had to have come from another person," Dr. Joseph stated, "[m]ore likely than not it came from another person." When commenting specifically, Dr. Joseph identified oral flora exiting Dr. Giuliano's uncovered mouth as "the most likely" source of the infection. To form these opinions, Dr. Joseph compared the probable sources of GBS infection in the SVH radiological suite on June 17, 2009, including Katherine's skin and Dr. Giuliano's mouth. He applied case studies linking post-myelogram meningitis to the treating radiologists' oral flora, identified radiologists' uncovered mouths as the most likely source of post-myelogram infections, and testified that "numerous publications" had shown that masks generally reduced "respiratory shedding" of bacteria from the oral cavity. Dr. Joseph also testified that Katherine's skin was an unlikely source of GBS considering the rapid onset of the meningitis and the course of antibiotics that Katherine had taken prior to the procedure. Applying his training and experience to these facts, Dr. Joseph gave an expert opinion that Dr. Giuliano's failure to wear a mask "most likely" caused Katherine's meningitis. Whether Dr. Joseph "gathered and examined sufficient facts, and correctly applied the facts to reach his opinions, was a question for the jury to decide after cross-examination, presentation of contrary evidence, and application of the law." *Harris*, ¶ 37.

¶39 From the foregoing, we conclude that it was an abuse of discretion for the court to find that Dr. Joseph's opinion was inadmissible under M. R. Evid. 702 and our *Dallas* progeny. Moreover, despite Defendants' claims to the contrary, Plaintiffs are not required to trace the precise path of the infecting GBS bacterium from Dr. Giuliano's mouth into Katherine's CSF to satisfy the more likely than not standard. We require

18

experts to opine on probability, and this standard does not require the level of exactitude that Defendants claim.

¶40 This analysis comports with our holding in *Butler*. In *Butler,* we upheld the District Court's exclusion of a medical expert's testimony that one doctor's epidural injection, when weighed against a second injection, "could have" caused the plaintiff's infection. *Butler*, ¶ 15. There, the expert indicated that it was a *possibility* that the other injection could have caused the infection. *Butler*, ¶ 15. When presented with the only two viable options, the expert equivocated, and we held that this did not meet the required "more likely than not" standard. *Butler*, ¶ 15; *see also Hinkle ex rel. Hinkle v. Shepherd Sch. Dist. # 37*, 2004 MT 175, ¶ 38, 322 Mont. 80, 93 P.3d 1239. Here, in contrast, when Dr. Joseph was presented with the two possible sources of infection, Katherine's skin and Dr. Giuliano's oral pharynx, Dr. Joseph stated it was "most likely," based on the available scientific literature, that the infection came from Dr. Giuliano and that "in my opinion I don't see a more likely source for this bacteria." If, in Dr. Joseph's opinion, no other possible source is more likely and Dr. Giuliano is the most likely, this surely meets our "more likely than not" standard.

¶41 *3. Did the District Court err in granting summary judgment?*

¶42 Because we conclude that the court abused its discretion by excluding Dr. Joseph's testimony on the applicable standards of care and causation, we therefore must vacate the orders of summary judgment in favor of both Dr. Giuliano and Saint Vincent's Hospital. *Butler*, ¶ 21.

¶43 *4. Did the District Court err by granting deposition costs to Defendants?*

19

¶44 Because we are reversing and remanding the court's grant of summary judgment, Plaintiffs' claim concerning the recovery of deposition costs is moot. *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶ 31, 333 Mont. 331, 142 P.3d 864.

## CONCLUSION

¶45 The District Court's October 11, 2011, judgment is reversed and remanded for further proceedings consistent with this Opinion.


/S/ MICHAEL E WHEAT


We Concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ JIM RICE
/S/ BRIAN MORRIS

20